The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
October 27, 2022

## 2022COA126

**22CA0291 *Peo in Interest of Joergensen* — Criminal Law — Competency to Proceed — Involuntary Administration of Medication — *Sell* Test — Procedure After Determination of Competency or Incompetency**

This appeal arises out of a court order declining to authorize the involuntary medication of the defendant, who is presently incompetent and facing criminal charges. The court concluded the People had met their burden to prove three of the four factors required by *Sell v. United States*, 539 U.S. 166 (2003), to authorize an involuntary medication order. The court also concluded that the People proved the requested medication would render the defendant competent. But the court also found that if the defendant was restored to competency, he would cease taking the prescribed medication and, as a result, would become incompetent before he could be tried on the criminal charges. Based upon these findings,

the court concluded that the People had failed to prove that the defendant would be rendered competent and that he would remain competent until he could be tried on the underlying criminal charges. Thus, the court concluded, the People had failed to meet their burden under the second *Sell* factor and denied the request for an involuntary medication order.

No reported Colorado case has addressed whether the People are required to prove that a prescribed medication would render a defendant competent to stand trial *and that the defendant's competency would be maintained until the trial actually occurs.* The division of the court of appeals determines that *Sell* does not impose such a requirement. Additionally, and also as a matter of first impression, the division concludes that a *Sell* order may subject a defendant to involuntary medication to maintain their competency until such time as the trial is completed.

The division therefore reverses and remands the matter for further proceedings.

COLORADO COURT OF APPEALS      **2022COA126**

Court of Appeals No. 22CA0291
Pueblo County District Court No. 21MH284
Honorable Tim O'Shea, Judge

The People of the State of Colorado,

Petitioner-Appellant,

In the Interest of Jesper Joergensen,

Respondent-Appellee.

ORDER REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE SCHUTZ
J. Jones and Welling, JJ., concur

Announced October 27, 2022

Cynthia Mitchell, County Attorney, Kate H. Shafer, Special Assistant County Attorney, Sarah Long, Assistant County Attorney, Pueblo, Colorado, for Petitioner-Appellant

The Law Firm of John L. Rice, John L. Rice, Pueblo, Colorado, for Respondent-Appellee

¶ 1    Few cases involve interests as weighty as those in which the state seeks to involuntarily medicate an individual, particularly when undertaken to restore their competency to stand trial.  But as the United States Court of Appeals for the Fourth Circuit succinctly stated in *United States v. Bush*, 585 F.3d 806, 813 (4th Cir. 2009),

> It surely is not an overstatement to observe that the government's ability to enforce the criminal laws in accordance with due process is the foundation on which social order rests and from which individual liberties emanate. Thus, when an individual commits a crime, he forfeits his liberty interests to the extent necessary for the government to bring him to trial.

¶ 2    In *Sell v. United States*, 539 U.S. 166, 179-82 (2003), the Supreme Court considered the delicate balance between a person's liberty interests in being free from unwanted medication and the societal interest in restoring to competency and bringing to trial a person accused of committing a serious crime.  *Sell* sets forth a four-part test that the government must satisfy before it may obtain a court order authorizing it to medicate an accused in such circumstances:

> First, a court must find that *important* governmental interests are at stake. . . .

2

. . . .

> Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests . . . [and] that administration of the drugs is substantially likely to render the defendant competent to stand trial . . . [without] side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense . . . .

> Third, the court must conclude that involuntary medication is *necessary* to further those interests . . . [and] that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. . . .

> Fourth, . . . the court must conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition.

*Id.* at 180-81.

¶ 3    This case focuses on the second of these factors.  We conclude that factor does not require the People to prove both that a defendant will be rendered competent to stand trial and that such competency will continue through the date of trial.  Relatedly, we conclude that, if necessary, a *Sell* order may subject a defendant to involuntary medication to maintain their competency until such time as the trial is completed.  Therefore, we reverse.

3

## I. Factual Background and Procedural Setting

¶ 4    Jesper Joergensen is accused of intentionally setting a fire in Costilla County that burned more than 100,000 acres and destroyed more than 140 structures.  The People charged him with 208 counts of arson in July of 2018.  Since then, Joergensen has been found incompetent to stand trial on numerous occasions.  In April 2020, the Costilla County District Court committed Joergensen to the custody of the Colorado Department of Human Services (CDHS) for competency restoration services.  Joergensen was eventually transferred to the Colorado Mental Health Institute at Pueblo (CMHIP).

### A.    The Initial *Sell* Hearing[1]

¶ 5    While at CMHIP, Joergensen refused to voluntarily take medication that his treatment team prescribed to restore him to competency.  In August 2021, the People requested a *Sell* order authorizing the medical professionals treating Joergensen to

---

[1] Because of the controlling import of the test in *Sell v. United States*, 539 U.S. 166, 180-81 (2003), a hearing at which an involuntary medication order is requested to restore a defendant's competency is frequently referred to as a *Sell* hearing, and the resulting order as a *Sell* order.

administer the following medications to him: Abilify, Geodon (both orally and by intramuscular injection), and Depakote. After a contested *Sell* hearing, the district court located in Pueblo County[2] (the mental health court) authorized CMHIP to involuntarily medicate Joergensen with Abilify only. Once this order was in place, Joergensen began to voluntarily take Abilify orally once a day and was doing so without physical force because he wanted to avoid being involuntarily administered injections as authorized by the court.

¶ 6 A few weeks later, Joergensen's lawyers in the criminal case pending against him in Costilla County filed a motion for reconsideration. The mental health court granted the request for a hearing to address whether reconsideration of its order was appropriate. The court left in place the existing order authorizing the involuntary administration of Abilify, pending further order of the court.

---

[2] A *Sell* hearing is properly located in the jurisdiction in which the defendant is located, in this case Pueblo County. § 16-8.5-112(2), C.R.S. 2022.

## B. The Second *Sell* Hearing

¶ 7 After a second contested hearing in November 2021, the mental health court granted the motion for reconsideration and rescinded its prior involuntary medication order. It subsequently entered a written order setting forth its extensive factual findings and legal conclusions. The court determined that the People had met their burden with respect to factors one, three, and four of the *Sell* test. But the court found that the People had failed to meet their burden as to the second factor, which it interpreted as requiring proof that the administration of Abilify would render Joergensen competent *and that he would maintain his competency until he was brought to trial.*

¶ 8 The court found that Abilify was likely to return Joergensen to competency. Joergensen had been taking Abilify orally in accordance with the court's August order prior to the November *Sell* hearing, but as previously noted, he was only doing so to avoid being forcibly medicated. Joergensen's mental functioning had improved as of the date of the hearing, but he had not yet been fully restored to competency.

¶ 9    But the mental health court went on to make a series of factual findings that led it to conclude that Joergensen's competence would not persist through trial.  First, the court found that once Joergensen was returned to competency, he would be sent from CMHIP to the Costilla County jail.  Second, crediting the testimony of Costilla County Sheriff Danny Sanchez, the court found that because of staff limitations, the Costilla County jail was not in a position to administer medications to inmates on an involuntary basis.  Thus, the court found that once Joergensen was restored to competency, he would immediately cease taking Abilify, and shortly thereafter, he would decompensate to a degree that he would no longer be competent to stand trial.

¶ 10    Coupling these factual findings, the mental health court determined that although Abilify, whether involuntarily administered or voluntarily taken, would restore Joergensen to a mental state in which he was competent to stand trial, he would not remain competent until the time of trial because of where he would be held pending trial.  Thus, the court reasoned, the People had failed to prove that Abilify would render Joergensen competent until such time as he could stand trial.  The People appeal this order.

7

## II.    Standard of Review

¶ 11    The resolution of a *Sell* motion presents a mixed question of fact and law. *People in Interest of Hardesty*, 2014 COA 138, ¶ 14. We review the court's factual findings for clear error, and we review its application of those facts to the controlling legal standards de novo. *Id.*

¶ 12    At the *Sell* hearing, the People bear the burden of proving each of the four elements by clear and convincing evidence. *People in Interest of R.F.*, 2019 COA 110, ¶ 17.

## III.    Analysis

¶ 13    As discussed above, the People do not contest the mental health court's factual and legal conclusions with respect to *Sell* factors one, three, and four. They argue, however, that the court misinterpreted the second *Sell* factor, and particularly, they take issue with the court's conclusion that Joergensen's potential decompensation if he stops taking Abilify in the future prohibits the present entry of an order authorizing the involuntary administration of Abilify. We agree that the mental health court erred.

## A. When is "Competency to Stand Trial" Measured?

¶ 14    The second *Sell* factor requires the People to demonstrate that the administration of the requested medication is substantially likely to render the defendant competent to stand trial.  The factor does not expressly require the People to prove that the defendant is substantially likely to remain competent to stand trial until some future date.  Nonetheless, the mental health court required the People to demonstrate that, if prescribed the medication, Joergensen would not only be rendered competent to stand trial but would also continue to remain competent until the trial occurs.

¶ 15    But neither the mental health court nor Joergensen cites any authority requiring the People to affirmatively demonstrate that a defendant will continue to voluntarily take medication or that jail personnel will administer the medication so that the defendant will not decompensate to incompetency before he can be brought to trial.  Absent express authority requiring such proof, we are unwilling to impose that condition.  Our decision is grounded in the objectives underlying our competency statutes, the statutory scheme the General Assembly adopted to accomplish those

objectives, and the need to guard against orders that are necessarily speculative about what will occur in the future.

### B. Relevant Competency Statutes

¶ 16    As a starting point, competency is generally measured as of an existing date — such as the date that a defendant is examined or that a contested hearing is held.  Colorado's competency statutes speak in terms of "competency to proceed."

> "Competent to proceed" means that the defendant does not have a mental disability or developmental disability that prevents the defendant from having *sufficient present ability* to consult with the defendant's lawyer with a reasonable degree of rational understanding in order to assist in the defense or prevents the defendant from having a rational and factual understanding of the criminal proceedings.

§ 16-8.5-101(5), C.R.S. 2022 (emphasis added); *see also Pruett v. Barry*, 696 P.2d 789, 792 (Colo. 1985) (To be deemed competent to stand trial, "it must appear that the accused has *[sufficient] present ability* to consult with his attorney with a reasonable degree of rational understanding, and that he has a rational as well as a factual understanding of the proceedings against him." (quoting *Kostic v. Smedley*, 522 P.2d 535, 538 (Alaska 1974))) (emphasis added) (footnote omitted).  The mental health court properly

10

concluded, with ample record support, that the prescribed Abilify would return Joergensen to a mental state in which he had this *present ability* to consult with his lawyer to assist in his defense.

¶ 17    But the mental health court interpreted Sell to also require that the People prove that Joergensen would remain competent until such time as he could be tried.  The court's conclusion rested on its interpretation of section 16-8.5-112(4), C.R.S. 2022, which provides as follows:

> If a defendant committed to the custody of [CDHS[3]] for evaluation or for restoration treatment is ordered by a court to accept treatment . . . and is subsequently returned to jail for pending court proceedings, the county jail *may* require the defendant to continue to receive the same court-ordered treatment that was administered by [CDHS] before the defendant was discharged from inpatient care, or, alternatively, appropriate medical personnel provided by the jail *may* forcibly administer such court-ordered medication to the defendant.

---

[3] The competency statutes use the word "department," which is defined as the Colorado Department of Human Services (CDHS).  *See* § 16-8.5-101(9), C.R.S. 2022.  CDHS, in turn, manages, supervises, and controls CMHIP.  *See* § 27-90-104(1)(a), C.R.S. 2022.

(Emphasis added.)  The court concluded that the statute's use of the term "may" authorizes, but does not require, jail staff to administer the court-ordered medication, whether directly or through the use of third parties.  In other words, the court concluded that the statute gives local sheriffs complete and unfettered discretion whether to continue to subject a defendant to involuntary medications.

¶ 18     To begin, we are not persuaded that the legislature's use of "may" in this context necessarily leads to the conclusion that the sheriff is authorized to unilaterally decide whether a defendant will or will not be required to continue to comply with an involuntary medication order.  Instead, the use of "may" in this context is better understood to simply *authorize* the sheriff to permit jail personnel or other qualified medical professionals to involuntarily medicate a defendant subject to an involuntary medication order once the defendant is returned to the county jail.  In other words, "may" in this context is a grant of authority to the county jail to continue to enforce an involuntary medication order, but not a grant of discretion to unilaterally decline to enforce such an order.  And we reject the notion that the statute's use of the word "may" somehow

12

requires — or even permits — a mental health court to consider whether a particular county jail is able or willing to effectuate a *Sell* order when deciding whether the *Sell* factors are satisfied, including whether a defendant is likely to maintain his competency until being brought to trial.

¶ 19 Moreover, even if we accept, for the sake of argument, that the mental health court's interpretation of section 16-8.5-112(4) is accurate, it does not necessarily follow that the factual scenario envisioned by that court will come to pass.

C. The Mental Health Court's Improper Factual Assumptions

¶ 20 From a factual perspective, the mental health court's construction of the statute requires courts to speculate about what a defendant will do or not do at some future time when he is restored to competency. *See, e.g., People v. Marez,* 916 P.2d 543, 547 (Colo. App. 1995) (trial court's legal determination of exigent circumstances may not be based upon speculation). We recognize that Joergensen's testimony supported the court's findings that he would not voluntarily take Abilify once returned to competency. But Joergensen was incompetent at the time he provided this testimony. It is entirely possible that once rendered competent and

benefitting from enhanced mental capabilities, Joergensen may agree to take the prescribed Abilify voluntarily and without a court order authorizing involuntary medication. Thus, the mental health court's order is predicated upon a factual scenario that may not come to pass.

¶ 21 More importantly, the competency statutes do not mandate that once a defendant is restored to competency, he must be returned to the local jail where the charges are pending. Specifically, section 16-8.5-111(3)(a), C.R.S. 2022, provides:

> When [CDHS] submits a report to the court that it is the position of [CDHS] that the defendant is restored to competency, the defendant *may* be returned to the custody of the county jail.

(Emphasis added.) Thus, the statute does not mandate that a restored defendant be returned to the county jail but, rather, uses the permissive language "may be returned to the . . . county jail." And nothing in the original order authorizing the involuntary medication of Joergensen required that he be returned to the Costilla County jail immediately upon being restored to competency. Therefore, if Joergensen is restored to competency, the executive director of CDHS — knowing that the Costilla County Sheriff may

14

not have the ability to administer medications on an involuntary basis — may elect to keep Joergensen at CMHIP until the trial can be held.

¶ 22    As evidenced by the remote *Sell* hearing held in this case, if Joergensen remained at CMHIP until his trial date, electronic communications could be established between Joergensen and his counsel to allow him to assist in the preparation of his defense.  In addition, the evidence presented established that once rendered competent, Joergensen was not likely to become incompetent until the passage of thirty to forty days.  Thus, he could be transported to Costilla County jail at the time of trial, and the trial could likely be completed while he remained in a competent state.

¶ 23    Moreover, even if Joergensen were returned to the Costilla County jail, section 16-8.5-111(3)(a) provides that

> [CDHS] shall notify the sheriff of the jurisdiction where the defendant is to be returned and the court liaison. . . .  When a defendant is transferred to the physical custody of the sheriff, [CDHS] shall work with the sheriff and any behavioral health providers in the jail to ensure that the jail has the necessary information to prevent any decompensation by the defendant while the defendant is in jail, which must include medication information when clinically

> appropriate. The report to the court must also include a statement that [CDHS] is returning the defendant to the custody of the county jail.

Thus, the statute clearly contemplates communication and cooperation between CDHS and the county sheriff to facilitate an orderly transfer of the restored defendant and to ensure there is no decompensation.

¶ 24    The mental health court's order also requires speculation about what would happen in the future assuming Joergensen is returned to the county jail. Sheriff Sanchez testified that the problem with involuntarily medicating Joergensen at the Costilla County jail is a lack of personnel qualified to administer the medication. But Sheriff Sanchez also testified that he would attempt to work with outside medical professionals to involuntarily administer the medication if required to do so by court order. Stated otherwise, if he received adequate resources, and there was a court order in place requiring him to facilitate the involuntary administration of Abilify, Sheriff Sanchez stated he would do his level best to fulfill that order. Given the significance and priority of bringing this case to trial for Joergensen, the People, and the alleged victims, we believe that it is improper to speculate or

16

assume that it will not be possible to involuntarily medicate Joergensen if he is returned to the Costilla County jail.

### D. The Mental Health Court's Improper Legal Assumption

¶ 25    Finally, we do not agree with the mental health court's legal assumption that it is not possible to order Joergensen to be involuntarily medicated if he is returned to jail after his restoration to competency.

¶ 26    The first and last sentences of section 16-8.5-111(3)(a) contemplate that CDHS will notify the court where the criminal charges are pending of any impending transfer.  Thus, the criminal court will also have notice of any issues concerning potential decompensation at the time of Joergensen's transfer to the local jail. Nothing in Colorado's statutory framework precludes the criminal court from entering appropriate orders to ensure that Joergensen continues to receive the necessary medications so that he does not decompensate and thereby frustrate the central purposes of the competency statutes.

¶ 27    Moreover, federal precedent applying *Sell* supports the conclusion that a court may enter orders to require an incompetent defendant to receive medication involuntarily, if necessary, once

restored to competency to avoid decompensation either before or during the trial. *United States v. Mitchell*, 11 F.4th 668, 674 (8th Cir. 2021). As explained by the court in *Mitchell*,

> By focusing solely on the word "render," Mitchell overlooks an important aspect of the *Sell* standard: "whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant competent to stand trial." Under *Sell*, the mere competency of a defendant, standing alone, is not the governmental interest at stake. Competency *to stand trial* is. And as Mitchell acknowledges, *Sell* authorizes the government not only to involuntarily medicate an incompetent defendant, but also to continue doing so during trial. Permitting involuntary medication through the conclusion of trial ensures, at the risk of stating the obvious, that the defendant will remain — at all necessary times — "competent to stand trial." . . . Given that the purpose of involuntary medication under *Sell* is to ensure the defendant is competent enough to participate in trial, adopting a rule that categorically prohibits the involuntary medication of a defendant who has regained competency for some period of time, but who is unable to maintain it, would frustrate that purpose where an important governmental interest is at stake.

*Id.* at 673 (citations omitted). We find this reasoning persuasive.

¶ 28    Joergensen attempts to distinguish *Mitchell* by arguing that federal statutes expressly authorize the administration of medication to retain a defendant's competency.  But the analysis and holding in *Mitchell* were not predicated upon any such statute but, rather, on a commonsense recognition of the competing interests that *Sell* balances.  *Id.*

¶ 29    Additionally, although it may not be expressly authorized by Colorado's competency statutes, it is consistent with the core purpose of our statutes to permit courts to require a competent defendant to continue to be medicated leading up to and during trial to ensure that they do not become incompetent.  The failure to recognize such authority would sanction a result directly at odds with the statutes' central purpose.  As the mental health court acknowledged, the practical consequence of its interpretation of section 16-8.5-112(4)

> is to empower county sheriffs, through their discretion, to continue or not continue court-ordered treatment, with the ability to terminate court-ordered medication at the CMHIP gates, thus undoing the hard work and expenditure of state resources of physicians, CMHIP staff, county attorneys, respondent's attorneys, and court staff (both criminal and civil), and

> reversing the therapeutic gains made by the patients themselves.

We appreciate the mental health court's candor in its assessment of the practical consequences of its interpretation of the statute. But we part ways with the mental health court's conclusion that section 16-8.5-112(4) dictates such a result. Rather, we conclude that neither section 16-8.5-112(4) nor the balance of the competency statutes contemplates such a result. Instead, we conclude that the competency statutes permit a court, if necessary, to order a defendant to continue to receive appropriate medication to ensure that they are restored to competency and to continue such involuntary medication until the defendant's trial is completed.

¶ 30     The mental health court failed to contemplate the possibility that a court may require a defendant to be subject to an involuntary mediation order once restored to competency or its ability to enter alternative orders to ensure a defendant's competency is maintained. Instead, the court too narrowly construed our competency statutes and their purpose, and it assumed factual developments that may not come to pass.

## IV. Conclusion

For the reasons stated, we reverse the mental health court's order and remand the case for further proceedings consistent with this opinion. On remand, the mental health court shall immediately reinstate the order subjecting Joergensen to the involuntary administration of Abilify. Incident thereto, the court may extend the duration of the order through the date of any trial that may be held in this case, or the court may delay the decision of whether to extend the order through the date of a trial pending any additional hearing that may be held after Joergensen is returned to competency.

JUDGE J. JONES and JUDGE WELLING concur.